Ms. Davidson-Welling? Yes, Your Honor. And you're representing the appellants here? Yes, I am. Pleased to have you here. Look forward to your argument. Thank you, Your Honor. May it please the court. My name is Maureen Davidson-Welling and I represent the appellants who are PPG retirees or the surviving spouses of deceased PPG retirees. As you know, this case arises from PPG's decision to terminate the retiree life insurance coverage of retirees and to transfer them to a third-party axial in connection with a sale of operations. Before you go there, let's make sure we have those facts right. You said PPG terminated. Did they? Yes, they did. PPG terminated the coverage of the life insurance plan as the plan administrator testified, and that's at JA 1359 to 1360. What year did they do that? That termination occurred in, I believe, in early 2013. When did they transfer that particular interest to the third-party? So after the sale was completed, they transferred the liabilities. They transferred the retirees after terminating their PPG life insurance coverage. They transferred the retirees to Axial Corporation, to a benefit plan there. So Axial Corporation had it after the transfer. They continued to make payments for it? Who made the payments on this life insurance and all this thing? Well, so Axial set up its own life insurance benefit plans, right? And Axial was in charge of those benefit plans, which it kept for a couple of years. The PPG life insurance plan continued during that time to provide PPG life insurance to other PPG retirees who had not been removed because of the sale of operations. I just want to be clear on it, because maybe I just didn't read it quite that way. You're saying there are two life insurance plans here? Yes, Your Honor. One is Axial, and the other one, and that one, it's not the same one that was PPG. PPG kept this one going with the other sections. That is correct, Your Honor. There was the initial PPG life insurance plan, which continues today, and then Axial, after they were transferred over, set up a separate Axial benefit plan, which was in existence for a couple of years, and then no longer. These employees were dropped out of it? Correct. Okay. I just want to make sure I understand it. PPG, you're saying they didn't terminate the coverage. They didn't terminate the coverage. And you're also saying that it wasn't a fact that when they did this, that it was Axial who continued the coverage under their plan for two years, for the same thing that they had from PPG. So, PPG terminated the life insurance coverage under the PPG life insurance policy, right? The retiree's coverage under the PPG plan terminated. That happened. And then there was a separate later termination of benefits that was conducted by Axial. In effect, there were two terminations here. And the one that is at issue is the termination by PPG of the retirees from its benefit plans. And this is a welfare benefit. Like, in large part, with the exception of the surviving spouse income benefit. But yes, the greater part of the life insurance plan is a welfare plan. So, the district court below aired in dismissing retirees claims, and we asked that be reversed on counts one, seven, and eight, because... You're appealing three counts. Correct. One, seven, and eight. Yes, we are. And that's because PPG's actions violated the terms of the life insurance plan. And you're focusing, as I see it, on a 15-year span from 1969 to 1984? Yeah. Yes. With respect to vesting, right? There's sort of two separate theories of liability on count one. One is a violation of plan terms, but there's also an issue because there was vesting, right? And this is like the thing that never happens. Can you point me to the clear-and-express vesting language that was in the plan in those years? So, well, prior to... Well, let me see if I can answer that. Prior to 1969, there was a reservation of rights clause in the PPG plan, right? And then in 1969, PPG decided to remove that language from the plan. Right. So, that's language that was not in the plan. But what language that was in the plan showed a clear-and-express intent to vest? Well, so, we contend two things. One, there was language... The SIB benefit is referred to as a guaranteed lifetime income, which is contractual vesting language. But in addition to that, this court in Gable v. Sweetheart Cup recognized that removal or that addition of a reservation of rights clause into a plan demonstrates intent not to vest benefits. Logically, the converse is also true. So, I thought in your brief, you said there was no clear-and-express language that showed vesting, and that's why you have to rely on this, the argument you're there wasn't a reservation of rights during those years. Therefore, we can infer vesting. Well, if I could clarify that a little bit, I think that the act of physically giving up and amending the plan to remove the reservation of rights was a clear manifestation of intent to vest benefits, that act. And that inference is confirmed by the Employee Benefit Committee which say, these are the official minutes of the committee in charge with overseeing PPG's welfare plan. But you acknowledge that our precedent says there should be clear-and-express language of vesting, right? Not in the minutes, but in the plan. So, I think that this court's precedents do... I'm trying to think if the exact language is that, that there needs to be a clear manifestation. Now, keep in mind, there aren't any cases that this court has considered anything like this. This fact pattern is really, really unusual. There might never be another one of clear manifestation of intent. It's different than what was conceived of before, but nobody ever considered this, right? This might be a different way of... What makes this so different? Is it because it's dealing with surviving spouse here, as what you're talking about? And also, probably because generally when a pension... It's not a pension, I know it's a welfare, but when it's vested, the individual who gets vested it, there's no contingency on it. Here, you can have a surviving spouse, but you get divorced or separated or the spouse goes away, you don't have it. And so, you can have a vested right, but it can become unvested by the employee who's working there, which is kind of interesting to me. Isn't it interesting that you're saying it's vested, but it's vested that the rights of a surviving spouse to get its lifetime insurance benefits that's contingent, of course, on death, which I guess would be a vested interest, vesting of it, it's going to depend on this employee continuing to be married to that spouse. So, if he or she decides, I'm going to separate, I can get rid of your vested interest. Is that right? So, there's a lot there. Let me see if I can... No, it's pretty simple. It's pretty simple. It's only dealing with this surviving spouse vested thing that I think is interesting. You said it's different, and I'm saying, I agree. That sounds very different to me for characterizing it as a vested interest, because it's dealing with a third party. It's not the employee, the vested interest. And you're saying, but employee gets his vested interest for his wife because it's only spouse under the statute. If you separate or divorce that spouse, they don't get it. The benefit is exactly that. That's what you get. However, it is vested in the sense that it is unalterable by the employer after it's granted, right? And that, you know, benefits once they're vested cannot be... And as of 1969, they took or whatever it's called, Reservation of Rights provision out that would have allowed them to modify or terminate the plan. And in 1884, they put it back in. And then they didn't have any records to disclose as to what that was all about, except they later said they did it because it caused doubt in the minds of the retirees and the sense of security that retirees look for. Boys being absent, and they said the legal ability to enforce the Reservation of Rights was in doubt. They recognized the legal problems with it. Right. Your Honor is correct. Those employees... But they didn't come up with the discovery until after the summary judgment. No, they did not. The motions have been filed and submitted to the court. That is correct, Your Honor. That's the big distinction there, is that Reservation of Rights clause being there and then taken away and put back and then later on not being able to discover. Well, the Reservation of Rights clause that was added back into the plan in 1984 could not be effective as to the rights of vested rights, right? It could cut off rights for future hires. But as this court recognized in the Wheeler case, once an employer grants vested benefits, it can't take them away by amending... But now is vesting a legal question or a factual question? I think it is a legal question based on undisputed facts. Legal question for the... Then the district court said it was vested. The district court dismissed retiree's claim... The district court didn't actually address this particular point. That's right. The record did not... Well, why wouldn't vesting be a factual issue? Well, I think vesting in this case... I mean, the facts are undisputed in this case, right? That it's undisputed? Well, but it's a factual issue. But if it is disputed, you'd be entitled to a jury trial on whether it's vested. They were vested from 1969 to 1984. If there was a dispute, we would be entitled to a trial, yes. On that fact. At least that fact. I don't know what else. There might be other facts too. But on the vesting question, I thought you were going to say it was a factual question rather than a legal question. Well, it's just because the facts are... I think that the record, the record is undisputed on the facts that are here, but it is true. There is a dispute as to vesting. Because they didn't make discovery on it, you might be entitled to an adverse inference. Uh, yeah, I mean, I guess that would also be... I think you'd be arguing that. So in addition to the vesting question, there's also another argument that we have made, which is really just that PPG didn't follow the terms of its own plan. And it can't defend against that as it's tried by saying, hey, look, there was a reservation of rights in the plan because it didn't use it. You know, at the time of the Axial transaction, and this is separate from the vesting argument, which is a separate basis for liability. But the plan at that time, you know, ERISA plans are supposed to give employees, participants notice of their rights and obligations under the plan. Right, that's in the statute. The statute requires that participants be told about eligibility rules and events that can lead to the loss of coverage. That's in 29 U.S.C. 1022B, right? And here, over, you know, 30 years prior to the Axial transaction, that the plan, which was also the SPDs, or the same document in this case, had, you know, sections listing events by which you could lose coverage. And it never included a sale of operations, right? And that's evidence that that was not an intended basis on which you could lose operations. Now, as we've played out- It was transferred down to Georgia, wasn't contemplated anywhere. Correct. Let me ask you this, before you run out of your time here, how many retirees were affected by the termination of the benefits? So, there were, it's- You've got eight plaintiffs here. Got eight plaintiffs. You claim it's a class action. I don't remember the exact number, but it was more than a thousand, probably less than two. More than a thousand? How many were working, already working in 1969? I think, you know, I don't know that I've ever counted it, but I believe based on the records we have, a significant chunk of them would have been working between, at some point between 1969- No, but how many were working in 1969? Answer the question I asked. I do not know the exact number. How many were hired between 69 and 84? I do not know the exact number, although- How many were working 1984? Well, all of the retirees and many of the punitive class members. But you don't know? I don't know, have the exact numbers. I could determine that and submit a supplemental brief, if your honor would like. So that, you know, those, so, you know, yes, our position is that, that vesting, it occurred and it couldn't be taken away later. And, you know, and the EBC minutes really spell out that the reason that that amendment to the plan was made was in order to provide security to employees in response to their concerns, and make sure that those benefits were unalterable, that they, to reassure them that they wouldn't be taken away later. Well, that, that's why they did it. That's what those minutes said. And just sort of going back to the, to the, to the, the SIB, because we haven't really, that, that benefit is, is a, is a pension benefit under ERISA. SIB means Survivors Insurance Benefits. Yes, it does, your honor. These acronyms bother me. Yeah, there are many of them. Is it, I'd like to refer to it as SIB, if that's okay. That, but that, that survivor's benefit in the plan satisfy, satisfies the definition for a pension benefit, right? By, by definition, I might ask if, so this, this benefit could, the retiree could choose two different ways, right? A 50% lump sum or a 25% lump sum, and then monthly, is it monthly payments? Correct. If the retiree chose to have the 50% lump sum upon death, would it be a welfare benefit? Yes. So the same benefit, if the retiree chooses the 50% option, this is a welfare benefit. But if the retiree chooses, no, I want it paid out 25% and the monthly payments, the retiree has turned it into a pension benefit. So, so that, that is the language of the plan, right? You can waive part of your lump sum benefit, which is a welfare benefit in exchange for a guaranteed lifetime income. So it's a hybrid kind of thing? It is a hybrid kind of thing. But the money is all coming from this life insurance policy. It's not as though you choose the 25% and monthly payments, they start deducting something from your compensation to pay for those monthly payments. There's no difference in how it gets paid and how it's funded. Uh, right. There, there was, I think there was a separate class of premiums for individuals in this category who had elected the benefit. So yes, there was a difference in how, in the, in the payments. Are you, so are you claiming it's deferred? It then becomes deferred compensation if you choose 25%, but not if you choose 50%? We had alleged it as both a retirement income and deferral of compensation. So, but it sort of the, you know, Is there, is there evidence of that? Or was it actually compensation that was deferred or? Correct. And, and it was also retirement income, which is another basis. I'm sorry, I'm not asking characterize some of the statute. I'm saying, is there evidence that that's actually, that actually took place? That the compensation was withheld. So then be paid out in these monthly payments after death. The deferral of compensation, that part of the statute says that it can be deferral of compensation to retirement or beyond. Here you would have, it would be a deferral beyond. Correct. But so are there facts that show that that's what happened here? I mean, there are certainly facts that, that show that the benefits were granted and that, or that the benefits were offered and that they could make an election that would, that would extend when you would get compensation, right? Well, just, yeah, you're saying there are facts that show that you could choose 50% or 25%. And you're saying if you choose one, you make it a welfare plan. If you choose the other, you make it a pension plan. Right. The same benefit. The lump sum benefit is a, the lump sum benefit is a, is a welfare plan benefit, right? The guaranteed income is a pension benefit. So the lump sum on either option one or two is a welfare benefit. You're saying that it's only this payment for the surviving spouse that it becomes a pension benefit. Correct. Is that the, your view of it or is that the stipulated facts or is that a legal determination that you're making or that's been made by somebody? I do not believe that is illegal. Is that part of the agreement? Yeah, well. That part of an agreement that was, it's manifest in the paperwork here. Yes, I think it's manifest in the paperwork that you waive part of your sort of normal. The fact, the characterization is welfare or pension. Is that what you're telling us what it is? Is that the gospel? Is that the way it's, is y'all stipulate the party stipulate that that's the fact here that part of it is, it's a, that it's a hybrid operation and a part of it is a pension and part of it's welfare. There was no such stipulation. No such stipulation. So what, where are you coming up with that? That you've given us your opinion. That, that is. Is that your opinion, a legal opinion that you've come to? Or that's what the record reflects or I just don't, I don't know where it's coming from. Yeah, I think that that. Because I read all this stuff and I couldn't figure out what it was. The best I could and I'm not the expert in everything, but it was a mystery to me which one to switch and whether you could have a hybrid. I was surprised you'd say you could do that. Maybe you can. You all know where that is and I don't. Held as a hybrid. I mean, that is interesting language and it also opens up the question. What you're saying is option one, you have a complete welfare benefit. Option two, you didn't get a hybrid. Part of it's welfare. Part of it's hybrid. Where does that go? I mean, does it, is an option three possible where you could have multiple type things there and some of them would be welfare and some would be pension? How does that? And it's all come from the same plot. Going back to Judge Rush's book. Yeah, so ERISA sets out these definitions. How long does a survivor's spouse get this benefit if they opt for that? Until the spouse is deceased, I guess. Like social security benefits? Yeah, remainder of life. So everybody's kind of rolling the dice on how long it's, the checks are going to be out on a monthly basis. Could be six months or could be 40 years. Correct, right. And if you don't predecease your spouse, you don't get the benefit at all, even though it's irrevocable. Right, just like a normal, you know, just like a regular pension benefit. I mean, this surviving spouse income benefit in the life insurance plan was virtually identical to the same benefit in the pension plan. You know, both of them are paid to a surviving spouse. Both of them are annuity benefits. Both of them go for the rest of life. And, you know, the only difference is where it was described, but it's the nature of the benefit, not where it's located within the employee benefit plan that determines if something is a pension under ERISA. And it looks to me like I might be out of time. Well, if the surviving spouse was receiving benefits when the SIV, under SIV, when the life insurance benefits were terminated, were those monthly payments cut off or have they continued? So it is my understanding that those payments have continued, that the group that we're talking about. So they must have invested. Correct. So they must have invested. Yeah, yeah, I mean, we believe this is a, this is a, this is a, this is, pensions are non-forfeitable by statute, right? Welfare benefits can become vested contractually, but ERISA doesn't require that. In this case, with respect to the surviving spouse income benefit, it was both, right? You have this contract, you have this vesting language calling it, you know, guaranteed lifetime income. But you also have, by its nature, a lifetime annuity benefit to a retiring spouse provides retirement income. Well, under your hybrid theory, only the, only the monthly payments for people who chose that second option would vest. But the 50% and the 25% wouldn't be required to vest because they're welfare plans. They're not pension plans. The only pension plan under your hybrid approach is the monthly payments. And so different legal regimes would cover two parts of the same benefit. That's correct. Yeah. Well, we have extended your time a little bit here, but that's fine. We're trying to understand this thing and we'll be fair to the other side too. You've reserved some rebuttal time. Thank you. Mr. Torres? Yes, Your Honor. I'm glad to have you here. Look forward to your argument, sir. Thank you for having us, Your Honor. So may it please the court, I'd like to start with actually the surviving spouse pension question. So I think there's some arguments here that, that, that counsel is not accurately describing. The only document that they point to in support of this argument is the welfare plan that provides this benefit. And that has two components, as Your Honor noted. It either pays 50% upon the death of the retiree, or it pays 25% with subsequent payments. So there is no hybrid alternative. It talks about a life insurance benefit that can be paid two different ways. So you disagree with your opponent here? You say there is no hybrid. There is no hybrid. And the reason there is no hybrid is because we need to go back to the statute and see what Congress told us about how- Are these pension benefits or welfare benefits? That's exactly right, Your Honor. And the statute- Which are they? And it's a welfare benefit. All of them are welfare benefits? Yes, they are, Your Honor. No pension benefit? There is no pension benefit. In your view? In my view, and I think in the statute's view. Is that a factual question or a legal question? It's a factual question if you look at the text of the plan and you apply it to the statute. That's how you get to the answer that there is no pension benefit at issue here. How do we know what the plan was in 1969? Well, that's not relevant to this, Your Honor. The question is what the plan was at the time the benefits were transferred to Axiol under this court's rulings in Pierce and Gable. You look at the benefit plan at issue when the disputed act occurred, which was the transfer of these benefits to Axiol in 2013. And we know what the benefit plan said in 2013 because it's in the record of this case. And if you look at that language describing the two forms of payments, and then you go back to ERISA and you look at how it defines pensions and welfare benefits, you will find an answer to this question that's quite simple, not as complicated as counsel would suggest. A pension plan, by definition under the statute, provides retirement income to employees or results in a deferral of income by employees. Conversely, a welfare benefit is established for the purpose of providing for its participants or beneficiaries benefits in the event of death. What we're talking about here is not a payment to an employee because the employee is dead, nor are we talking about a deferral of income by the employee, because the payments that the spouse is receiving is coming from a life insurance policy that was unilaterally established by PPG. So, neither of these payment schemes that are set forth in the plan document that was in existence in 2013 fall within the clear definition of pensions that Congress established in 1974. All this other arguments about whether they're similar or whether it provides retirement income to a surviving spouse is all beside the point. This is a clear case of applying the statute to a clear and unambiguous payment scheme that's clearly set up in a retiree life insurance plan. So, this argument depended upon us determining, or at least your assumption, that there was no vesting of this prior to 1984? That if in fact there had been vested that, you know, could later plans then control or revoke previously vested benefits? Well, they could, your honor, because in 1969, none of these putative class members were surviving spouses. So, they hadn't yet begun receiving these payments. And none of these retirees now had retired yet. So, if you look at this court's decision in Pierce, where there was a benefit plan established in the 70s that provided lifetime benefits and then was subsequently amended to include a reservation of rights clause, this court said there's no vesting because before the challenged action occurred, the employer exercised its prerogative, as permitted under ERISA, to encumber a welfare benefit plan with a reservation of rights clause, which would defeat any claim that there was a vested benefit in 2013, regardless of what PPG may have said in 1969. I'm sorry, just one quick question. Does it matter if the vesting relates to a welfare benefit as opposed to a pension benefit? Congress drew a very clear distinction in ERISA that welfare benefits as a base proposition are not vested. It only established vesting requirements for pension plans. This court has recognized in a number of cases, though, that an employer can choose to vest a welfare benefit. However, this court has also repeatedly recognized that the inclusion of a reservation of rights clause in a welfare benefit plan defeats claims of vested benefits, Your Honor. So the fact that you can opt to establish a vested welfare benefit doesn't mean that you're somehow precluded under ERISA from later changing your mind and inserting a reservation of rights clause. That was the whole statutory purpose that Congress set forth, which this court has talked about in numerous ERISA decisions, that they wanted to give employers flexibility, Congress, in enacting ERISA, the ability to decide whether and when to provide welfare benefits. And that's why they drew this distinction between welfare benefits that aren't vested by statute and pension benefits that are. And what we're dealing with here is undisputedly a life insurance plan, and it undisputedly provides payments to a beneficiary upon the death of the retiree. That does not fit into the clear statutory definition for pensions, and that is why the claim fails. So clarify me, I'm following you, at least, and you mentioned a reservation of rights clause, and I was talking about pre-1984 potential vesting of welfare benefits. You're saying it's not statutory. It's something an employer would do. I agree with that. Pension would be statutory. But there was no reservation of rights clause prior to 1984. So the question is when or if, as construed in this welfare benefit, the right to life insurance vested, because it appears that PPG is arguing that there's no vesting prior to this retirement. We certainly believe that before a surviving spouse begins receiving a payment stream, under this plan, which clearly is the case now, because all these individuals went over to Axial, they weren't yet receiving that benefit. So we certainly agree that before they actually enter that status, there is an ability to terminate the benefit because they're not receiving it. That's the same for a life insurance policy, Your Honor. Until you actually receive the life insurance proceeds, PPG couldn't come to that person and say, well, now that the retiree's deceased, we've changed our mind. Give us that money back. We certainly would acknowledge at that point, that the payment has vested in the sense it's been provided to the participant. But before that happens, Your Honor, when someone is just in a retiree status and they've yet to die or their spouse has yet to begin receiving the payment streams, I think it is very clear that you have the right to say, we're no longer going to provide that benefit if it's non-vested. Prior to the reservation of rights clause, do you contend that the life insurance only vests upon death? Yes, I would say that, Your Honor. And the other thing I would say is that- They had to die before 1984. Well, if they had died before 1984, none of them were retirees before 1984, which was my next point, Your Honor. None of these individuals who are in this period- Adding to what Judge Wynne was mentioning, there was a reservation of rights in effect prior to 1984. It was in effect prior to 1969, and then it was scrubbed. It was scrubbed out. And it was removed because in the company's mind, it caused doubt in the minds of retirees and the sense of security that retirees look for was absent. And it was removed because the legal ability to enforce the reservation of rights was in doubt- Correct. According to the company's after-discovered records. Why didn't you hide all the records? We didn't hide any records, Your Honor. Oh, you didn't? We did not. Well, it didn't show up until after the summary judgment briefing had been completed. Well, I can answer both questions. If I could answer your question about 1969 first, and then I'll get to the second question you raised, Your Honor. I completely agree that that's what the records say about what was the state of affairs in 1969. And I'll say two things about that. Number one, the legal uncertainty that existed in 1969 about whether reservation of rights clauses could be enforced was resolved by Congress in 1974. So the fact that- I understand ERISA took care of this for you. Yes, it did. Well, not for me personally, Your Honor, but it certainly did take care of- I kind of thought you were going to say that. The legal uncertainty that the company had referred to back in 1969 when it removed the reservation of rights clause. By the time it reintroduced it in 1984, the legal certainty as to whether a reservation of rights clause could be enforced was eliminated. And they weren't the only company- Why'd you wait 10 years to reinstate it then if it was all ERISA? Well, Your Honor, I don't know that there's any facts in the record about that. Well, there could have been if you ought to come up with the records on time, maybe. Yes, Your Honor. There's no question about that. Well, I'll answer that question right now, Your Honor. The only records that were missing, Your Honor, were records showing the actual amendment by the Employee Benefits Committee in 1984 to include the reservation of rights clause in the plan. However, plaintiffs have known since the beginning of this litigation that there was no reservation of rights clause before 1984. In fact, they argued that the absence of a reservation of rights clause- Well, there was one prior to 1969. You disagree with me. Yes, Your Honor. But the court considered this and found that that's legally irrelevant to the question of what the vesting- Which court considered it? The lower court, Your Honor. That's what's on appeal here, though. No, it's not. They didn't- That's what's on appeal here is whether that's correct, what the lower court did. That's what we're reviewing. No, Your Honor, they filed a- I think we're trying to figure out whether that was correct or not, what the lower court did. They did- The plaintiffs did not appeal the denial of- We don't- I don't think it's deference on a summary judgment ruling. We have to look at it, don't we, de novo? Yes, Your Honor. That's right, yeah. And if it's a legal question, we look at it de novo. Yes, Your Honor. And a factual question, we look at it in the light and what's favorable to them. Yes, Your Honor. Oh, and that vesting sounds like a factual issue to me. Your Honor, under this court's decision in Pierce, I don't believe it's a factual question because this court has found that the subsequent introduction of reservation of rights language defeats claims for vested benefits. And we don't believe that an act that occurred before the statute that they based their claims on changes that analysis in any way. I don't think there's anything in ERISA that says, once you decide to vest a benefit, you can't invest it. That's the antithesis of what Congress did when it established this difference between welfare benefits and pension benefits. Well, I mean, you could tie your own hands, at least for, you know, people who are, who enter employment under a certain contract or retire under a certain contract. If you have clear language in your plan that says, you know, that shows an intention to vest this benefit and then you add a reservation of rights the next year, then people who, you know, people who had the previous plan, you've vested their rights. But I think I infer what you're saying here is that that language was absent before 1984. That's correct, Your Honor. Okay. So, but you agree with me that you can't just add a reservation of rights if you've previously had clear vesting language and somehow absolve yourself. No question, Your Honor. You couldn't unvest, could you? You couldn't unvest someone who's already attained it. If they were vested between 1974 or 1969 and 1984, you couldn't take it away from them. If there was other language in the plan that actually vested the benefits, Your Honor. And the district court didn't address that. The district court found that the answer... The district court didn't find anything because it's on summary judgment. But the district court didn't address that point. Well, I don't agree with that, Your Honor. I think the district court found that... The district court can't find in a summary judgment ruling. The district court has to accept the facts in the light most favorable to the other side. Yes, Your Honor. The district courts don't make findings of fact in summary judgment rulings. Yes, Your Honor. The district court didn't find. Go ahead. I apologize, Your Honor. Viewing the facts in favor of the plaintiffs, the district court did not find any vesting language in this plan when the changes were made. There are cases that this court has considered where someone became disabled. So they're receiving benefits under a benefit plan. And this court has said they vested in the benefit because they've actually gotten into the requisite status. And so now you can't take that stream of disability payments away from them. It's similar to the question that was asked about when someone becomes a retired... When they die and they receive the benefits, that's the vesting. It's not always going to be at the same point in time. So anyway, I'd like to move on to the other argument raised by plaintiffs unless the court has any further questions. But as to the contract claim, again, this court... Plaintiffs argue this case as if somehow this is some blank slate and this court's actually considered these same issues in a number of cases. On this question of whether there was a termination in 2013, this court in the Sedgman decision considered this very scenario where there were benefit obligations that were transferred to a different company. And this court found that there was no violation, that you could not hold the transfer company liable for the subsequent termination of those benefits. Because the transfer itself did not alter the entitlement to these benefits. The obligations went to the new company. The new company continued to provide those benefits. That's the same thing that happened in this case that this court addressed in the Sedgman decision. And it found that the claim for benefits... Or that the divestiture of this transfer, these benefit obligations didn't change plaintiff's position with regards to the benefit additions. The same is true here, Your Honor. They continue to receive those life insurance benefits or had the ability to potentially receive them for three additional years until Axial made an independent subsequent decision to terminate those benefits. And because these benefits were not vested, there was no delegation of contractual duty to Axial that would flow back to PPG once Axial terminated the benefits. And we cited in that regard, the Sixth Circuit's decision in Sengpil which specifically considered the argument they're making that somehow we had to get their consent or there was some improper delegation. So these are not issues. This case is not a unicorn. And these are issues that this court and other courts have considered. And even if it were to be that this case was... The transfer of the benefits was considered a termination, the fact remains that the plan at the time in question, as I mentioned ago, reserved the right to modify these benefits. So when plaintiffs say PPG didn't amend the plan or didn't take advantage of the Reservations of Rights clause, that's a straw man. There was no requirement to amend or terminate this plan in order to transfer the benefit obligations because the Reservations of Rights language itself said that PPG could amend or terminate the benefit plan or part of the benefit plan described herein as such applies to participants. And it further stated that PPG reserved the right to amend, modify, or terminate those benefits at any time and for any reason. And it couldn't do that if it had been vested pre-1984, though. That's right, Your Honor. They couldn't have. I agree with you, but we believe the facts in this case show that they're not. And so this idea that they're saying, well, PPG didn't amend or terminate the plan runs into their own contention that PPG wrongfully terminated their coverage during the actual transaction. The Reservations of Rights clause says PPG could terminate these benefit plans, as I said a moment ago. And given that language, PPG did not need to amend or terminate the plaintiff's, I'm sorry, PPG didn't need to amend or terminate the plan in order to terminate the plaintiff's participation in this plan. It already had that right given the breadth of the Reservations of Rights clause. So this idea that there was a failure to amend the plan or terminate the plan is a straw man. As to the additional arguments that they raise, it just fails to recognize that if you're complaining about disclosure obligations under ERISA, there's some requirement that you show reliance or prejudice, and they've made no efforts to make any such showings here. They're just simply trying to argue that somehow there was this failure contractually to provide these benefits after AXIOS ceased to provide them. But because these benefits were not vested, as we've argued, Your Honor, that there was never a renewed obligation by PPG to come in and continue to provide these benefits to the individuals in the pew. It all comes down, at least in terms of this year's issue, as to whether there was a vested before 1984. And you have this language in there, this guaranteed lifetime income language, and there is no reservation for 1994 in it. And it really does beg the question is, does that create an issue of fact, or does it create a situation where we have to have more to determine was there in fact a vesting? Yes, Your Honor, I think the answer to both of those questions is no. First, as to the presence of the guaranteed language, we cited numerous circuit court appeals decisions that have considered this very same dynamic of having guaranteed language in a plan that also has reservations of rights language. And the Sixth Circuit, the Tenth Circuit, I apologize, Your Honor, we cited cases from the Third, Sixth, Seventh, and Tenth Circuit, all of which considered vesting language, the benefits are for life, the benefits are until death. But in each of those cases, like this one, there was also a reservation of rights clause in the plan. And because ERISA requires us to read the contract as a whole, the courts reconciled the language and found that there was no vested benefit. That's where you're confused. You said in each of those cases, there was a reservation of rights clause, but there was not one in this case before 1984. That's where I'm getting confused. You keep bringing that up, the reservation of rights clause, there's not one before 1984 during the time you have this guaranteed income language in there in any of those cases. And so it seems like to me, we circle back on this vesting question and it's just not there. I think, I'm sorry, I didn't mean to interrupt you, Your Honor. No, go ahead, go ahead. As I say, I think we've already answered that question though, and that is, the Pierce case from this court answers that question, Your Honor. The fact that there wasn't a reservation of rights clause pre-84. It does, Your Honor. Maybe you could clarify for the court what we're talking about with the guaranteed language. Is that just in the spousal benefit or is that the entire life insurance policy? That's just the spousal benefit, Your Honor. It's not for the other retirees. There's no guaranteed language in any of the benefit plans for anyone else receiving these benefits, just the spousal population. But what I would say, Your Honor, is that Pierce does answer this question. Well, with all due respect, Your Honor, in that case, there was vesting language before the reservation of rights clause in that case was added. So, I mean, it lines up under the same fact pattern here where there was a period of time where there was vesting language. The employer subsequently introduced a reservation of rights clause into the benefit plan. And this court found that the introduction of that reservation of rights language allowed the company to terminate the benefits. In particular, on page 30 of that case, there's a long passage that we cite in our brief at page 26 that specifically addresses this factual dynamic of having vesting language that's later encumbered by a reservations of rights clause. And in fact, this court specifically noted that by the time the challenge action was adopted, the right to change the medical benefit provisions was quite clear in light of the subsequent introduction of the reservation of rights clause. So, Your Honor, I do believe that that answers this question of what do you do with vesting language that later gets encumbered by reservation of rights clause? This court has said in Pierce and Gable that you look at the benefit plan that's at issue when the challenged action takes place. The challenged action in this case took place in 2013. And by that point in time, there had been a reservation of rights clause for almost 30 years in this benefit plan. And so respectfully, under the precedent of this court, we believe that there can be no vesting given that sequence of events. And I see it taken a long time. Don't sit down yet. I got a couple more questions. Okay. Yes, Your Honor. Stay here with us till we finish with that. I ask you the same question I ask your opponent here. How many retirees were affected by the termination of the life insurance benefits? I believe she's right that it was about a thousand retirees who were affected by that. And how many were already working for PPG in 1969 or hired between 69 and 84? I believe most of them, if not all of them, would have fallen into that into that category, Your Honor. But I would also say that none of them had retired before the introduction of the reservation of rights language in 1984. If you have nothing further, thank you for your time today. And we'd ask that the district courts lower the lower courts opinion be upheld. Thank you. Thank you, Mr. Torres. We appreciate it. Ms. Davidson-Welling. Thank you, Your Honor. So I want to touch on a few of the points that Mr. Torres mentioned to you. First, Mr. Torres misstates Pierce. At that case, the plan always had a reservation of rights in the plan. The issue was that it hadn't that the reservation of rights in the plan had not been disclosed in the SPDs, which were separately issued. So that that that case is not on all fours with this case at all. It really says nothing about what the circumstances here where they're never where there wasn't in this critical period, a reservation of rights. And the reason for that was because it had been removed intentionally to best benefits. So, you know, and also, you know, similarly with Sedgeman, that case also does not control the analysis here. That that case, you know, simply simply said that, you know, look, benefits just didn't vest as a result of a divestiture. The plaintiffs there weren't qualified under the terms of the plan. And that nothing changed when they were, you know, when they were transferred. Again, not not controlling and really doesn't doesn't, you know, sort of meet the issues squarely on, you know. So with respect to sort of the points that are raised, Arisa doesn't take away vested benefits. The benefits here were vested in 1969 through 1984. And, you know, Arisa was was passed in the middle in the middle of that period. But it Arisa, you know, didn't retroactively go back and take away contractual rights that people already had. Right. Those rights were all were already vested. And Arisa didn't take them away. And the plan that that looks to be like if if vesting is has some semblance of being a factual issue, that you all are 180 degrees apart. Well, we are absolutely 180 degrees apart in the sense that we believe that very firmly that this there was vesting here in this period and that that there's a clear manifestation of that. He says nothing's best. That is what he says. You know, I stay right there. You say you are different, but it sounds like you're different on the conclusion. What what what facts are you disputing? Where are you? Where are you differing on the facts of what would lead to that conclusion? I don't I do not. I do not necessarily believe that the distinction is is on the facts. It's on the application of the law to those facts. Well, I want to make sure you answer Judge King's question. He said it looked like more of a factual determination as to what is besting that you had differences. And I'm asking, is it factual? Is it a legal question? So so the rest of the heart of what Judge King is going at here, you you said we're 180 degrees apart, and that was all sounding good until I was trying to figure out, well, where are you different? Other than the ultimate determination, this is vastly, he says is not. And and that's the difference. But when you get up into this area, the facts, I'm asking what's disputed? What is disputed? That the factual record is is what is available, that what happened in 1969 through 1984, to the extent that the records exist, it is not disputed. What is disputed is that, you know, we think that the inference from that is a very clear manifestation. They deliberately relinquish their rights and that that establishes that establishes vesting. Then this this was a proper question for summary judgment. You were saying there's no dispute in terms of the facts, but the ultimate determination is wrong as a matter of law. The ultimate determination was incorrect as a matter of law. So usually so you don't want a trial. You want a ruling in your favor on the word vesting. We do, Your Honor. You might be biting off more than you can chew. Well, if you know to the extent that there's a there that there is a that it could go either way, then if there's a fact, if it's a factual issue or if it's a mixed issue of law, in fact, it's something for a jury to decide. It way I've always understood these legal procedures work. If you go back to the facts and you started said, well, you know, the question is, whether in this instance was it vested? Was it vested based on the fact that this had a guaranteed income clause? I've not had. Does that make a difference? Whereas the different facts here that are being relied upon would change the outcome. Then we got a summary judgment problem where you are. It's a question of law, which is squarely before this court. We don't say anything back because you're telling me all this is undisputed. The facts that lead to it. Is that correct? Yes, I mean, the fact the factual record is undisputed. The inference from that may be in dispute, but the facts are not are not disputed. The legal application of the ultimate fact is disputed. Correct. If this thing is an ultimate fact. It's disputed for certain, for certain here between the two sides. If I might, if you have further questions on that, I'm happy to answer them. Otherwise, I have a few more points. I just wanted to maybe put a bow on it. So you're saying the parties disagree about the correct interpretation of the contract. That is correct. And we're trying to interpret the contract to determine whether rights vested or not. And that's not a factual dispute. That is the application of of law to facts of this contract that are not in dispute. The inferences may be in dispute. Thank you. Now, with respect to the with respect to the question, there was a briefly, Mr. Torres touched on, you know, what a pension benefit, who that pays to and cited the language of the pension benefit statute. You know, in Ray Lucent, the case that they cited in the Third Circuit specifically recognized that the statute says that it doesn't matter who the pension benefit is made to, that it doesn't matter the identity of the recipient. What matters is the nature of the benefit, whether it pays retirement income. Here, it's undisputed that paid retirement income it was a pension benefit and it was non-forfeitable by statute. You know, you know, did you say it's undisputed? It was a retirement benefit. It's it that it paid retirement income, right? The plan administrator testified when deposed that the S.I.B. Oh, I heard her testament. You're not saying that they actually have conceded that this is a retirement benefit because then we would just have wasted a bunch of time. Right. Yeah. You know, and with respect to we also just we also disagree on whether you know what the plan required in in in 2011, right? That that plan, right? It doesn't it doesn't permit them under the terms of that plan to terminate coverage. Now, Mr. Torres says, hey, look, you know, we didn't we had a reservation of rights clause in the plan, but it's undisputed that they never used it. And you have to use it. Like Arisa, written plan documents are the linchpin of the system of administration that Congress set in place in enacting Arisa, right? And this this court's precedents are very clear that that implied amendments to Arisa plans do absolutely nothing to change the terms of written of written coverage. You know, we cited the Health South Rehabilitation case, which said that there is not a single case that defendants have cited where a court said it was that they could they could just disregard the written plan terms. Arisa runs based on the plans. And, you know, the statute says, you know, you know, fiduciaries have to discharge their duties in accordance with the written plan instrument. And the plan must be administered in accordance with its written terms. If PPG wanted wanted to terminate coverage, which was not an event that it had listed in 30 years, it had to give notice in the SPDs and it and it had and it had to amend the plan. PPG had to comply with the plan as written or amended. And it did neither. Right there. Even if it had a reservation of rights in the plan, it it never used it. It's it. The plan administrator testified to that that that was a violation of law. And Arisa requires that any changes to the plan have to be made by amendments and following the formal procedures. And there is nothing that they just didn't do that here. It's undisputed. And that's another basis on which to find liability on count one. It doesn't even that is separate. It doesn't even depend on vesting. So. I think that. Just sort of, you know, going going back through here, you know that this, you know, there.  because because of the fact pattern. And it really, you know, the the undisputed facts show that that the plan was amended to take out that reservation of rights. There's nothing like this. And and that that act was a waiver of their of a contractual right. That was it. And, you know, the language in those committee minutes did say, well, you know, they weren't sure if they could enforce it, but it was still a right that they took out of the plan. And in the next 15 years, they did. You know, they issued an SVD pursuant to ERISA, which is the 1981 SVD, and it did not have any reservation of rights language. They knew about ERISA. It still didn't have any reservation of rights language, even though other benefit, other employee benefit plans in that same booklet had reservation of rights. The clear inference from this evidence is that that benefits at that point under the life insurance plan were vested that that they were they were vested. When you take this evidence and look at it, it shows that it was vested. PPT believed it was vested when they talked about putting the reservation of rights back into the plan. And in, you know, in 1984, there's there's an acknowledgement there that they knew that they didn't have that right and they needed, you know, if they wanted to be able to do it as to new hires, they needed to put it back into the plan that they had already granted vested benefits. They couldn't change that, that the reservation of rights they added in 1984 would only affect, you know, new hires who hadn't already been promised vested benefits. I think I might be out of time. I would just ask that, you know, we ask the district courts counts on 178 be, you know, be be reversed and that judgment be granted on the SID counts in retirees favor and remand for class certification and other, you know, other other things consistent with this court's opinion. Thank you very much. We appreciate it. It's good to have good lawyers here from the 7th Circuit and the 3rd Circuit. We're very pleased to have you. 4th Circuit has a unique practice that we've followed for years. At the conclusion of each argument, we come down to the well of the court. Judges, three judges do and shake hands with the lawyers and compliment them on their presentations. We're not doing that right now because of circumstances with the pandemic. So I'll just take that to the bench. We're very pleased to have you here. And thank you very much for your for your service to your clients and to the court. Thank you for the opportunity, Your Honor. Thank you. And with that, we will take this case under advisement and and we will call the next case.
judges: Robert B. King, James Andrew Wynn, Allison J. Rushing